Melvin **HACKETT,** Plaintiff,

v.

**FULTON COUNTY SCHOOL DISTRICT, et al.,** Defendants.

No. CIV.A.1:01–CV–0233–J.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 12, 2002.

George O. Lawson, Jr., Lawson & Thornton, Atlanta, GA, Lisa Reid Roberts, Lisa R. Roberts & Assocs., Newnan, GA, for Plaintiff.

Judith A. O'Brien, Sutherland Asbill & Brennan, Atlanta, GA, William J. Stemberger, Knight Stemberger & Gomez, Newnan, GA, for Defendant.

### ORDER

CARNES, District Judge.

The above-captioned action is before the Court on plaintiff's partial Motion for Summary Judgment [34], defendants Fulton County School District and Marquis Jones's Motion for Summary Judgment [35], and defendants Fulton County School District and Marquis Jones's Notice of Objection and Motion to Strike Affidavits [44].

The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that plaintiff's partial Motion for Summary Judgment [34] should be **GRANTED**, defendants Fulton County School District and Marquis Jones's Motion for Summary Judgment [35] should be **GRANTED**, and defendants Fulton County School District and Marquis Jones's Notice of Objection and Motion to Strike Affidavits [44] should be **DENIED**.

### FACTS

This case involves improper conduct by a high school teacher towards the plaintiff, one of his former students. Plaintiff Melvin Hackett is a 1999 graduate of Westlake High School in Fulton County, Georgia, where defendant William Kreil was a science teacher at the time plaintiff attended the school. When plaintiff was in the eleventh grade, during the 1997–1998 school year, defendant Kreil arranged for plaintiff and other students to come to his home on several occasions under the pretense of a bogus "scholarship program." One evening, when plaintiff was at defendant Kreil's home, the plaintiff was told he would be taking part in an experiment that required him to disrobe, put on a blindfold, and allow himself to be touched by an unknown person.

Although the plaintiff told no one about this experience at the time, defendant Kreil's bogus "scholarship program" and his inappropriate conduct towards students was brought to the attention of administrators, who later conducted an investigation into Kreil's conduct. Defendant Kreil ultimately resigned his position at Westlake and pled guilty to three separate criminal charges, including sexual assault against a person in custody, and is currently serving his sentence at Arrendale State Prison in Alto, Georgia.

Plaintiff filed the Complaint in this action on January 26, 2001. He has asserted claims under Title IX of the Education

Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.,* ("Title IX"); 42 U.S.C. § 1983 ("Section 1983"); and state law claims of negligence, negligent hiring, retention, and supervision, assault and battery, intentional infliction of emotional distress, and false imprisonment, against Fulton County School District, Marquis Jones, individually and in his official capacity as Principal of Westlake High School, and William Kreil, individually and in his official capacity as a teacher at Westlake High School. Plaintiff claims that defendant Kreil, acting under color of state law, violated his constitutional and statutory rights, and that Principal Jones and the Fulton County School District were aware of defendant Kreil's improper conduct towards students but acted with deliberate indifference to the plaintiff's rights in failing to prevent Kreil's conduct toward the plaintiff.

Unless otherwise indicated, the Court draws the undisputed facts from Defendants' "Statement of Undisputed Material Facts" ("SMF") [35]. If, however, plaintiff has disputed any of those facts, the Court has viewed all evidence and factual inferences in the light most favorable to plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the following facts are viewed in the light most favorable to plaintiff, and are assumed true only for the purposes of this discussion.

From 1995 through 1999, the plaintiff, Melvin Hackett, was a student in the math and science magnet program at Westlake High School, which is part of the Fulton County School District. (SMF at ¶ 1.) On or about May 10, 1995, defendant William Kreil applied for employment with the Fulton County School District, and was hired to be a science teacher at Westlake High School. (*Id.* at ¶¶ 2–3.) When he applied for employment, Kreil submitted a packet of information including an application, three references, his college and graduate school transcripts, his Louisiana and Georgia teaching certificates, his test scores, and an explanation of two incidents that he believed would appear on any criminal investigation report.[1] (*Id.* at ¶ 4.) Kreil's application was reviewed and he was interviewed for a position at Westlake High School. (*Id.* at ¶ 5.) After a hire recommendation was received from the principal, Kreil's application was reviewed again, the school district obtained additional references, confirmed Kreil's teaching certifications, and ran a criminal background check. (*Id.* at ¶ 5.)

Although the school district's background check did not reveal any previous charges or allegations against Kreil for misconduct involving students, there is no dispute that defendant Kreil failed to provide a complete and accurate picture of his employment history on his employment application with FCSD, and that he failed to disclose that he had been asked to resign from teaching positions at several schools in both Louisiana and Georgia because of allegations of improper conduct with minor students. (*See* Kreil Dep. at 5–45; Pl.'s Resp. To Defs. SMF ["Pl. SMF"] [38] at ¶ 4.) It is further undisputed, however, that, at the time Kreil was hired to teach at Westlake, FCSD was not aware that Kreil had been accused of improper conduct toward students in the past. (Defs. Reply to Pl. SMF [43] at ¶ 3.) The plaintiff contends, however, that the defendants failed to conduct a more thorough

---

**1.** Defendant Kreil had been arrested in Louisiana for filing false insurance claims, but the charges did not relate to any teaching position or conduct involving students. (*See* Kreil Dep. at 46.)

investigation of Kreil's background, and that, had they done so, their investigation might have revealed that Kreil had failed to disclose an accurate picture of his employment history and had failed to disclose that he had been accused of misconduct toward students in the past. (Pl. SMF [38] at ¶¶ 4–5.)

Plaintiff had defendant Kreil as his science teacher at Westlake H.S. in the ninth, eleventh, and twelfth grades. (SMF at ¶ 3.) In June, 1997, an incident involving Kreil was reported to school officials by another student. (*Id.* at ¶ 6.) Specifically, the student alleged that Kreil had asked her to make a telephone call to another teacher at the school, Todd Green, and to tell Green that if Green did not assist Kreil as he had promised, that Kreil might commit suicide. (*Id.* at ¶ 6; Souder Dep. at 12–13.) The school district assigned Linda Souders, Director of Procurement and Certification, to investigate this incident, and she discovered that Kreil and Green were involved in some sort of personal relationship, but Green did not want to elaborate on the specific nature of the relationship. (*Id.*) Souders reported the results of her investigation to Dr. Ernest Lavender, the Assistant Superintendent for Human Resources, who told her to ask Green if he wanted to file any formal complaint against Kreil, and Green told

Souders that he did not wish to do so. (*Id.* at ¶ 7; Souders Dep. at 14–15.)

Defendants contend that, other than the incident involving Todd Green, there were no further complaints about defendant Kreil from 1995 through some time in early 1999. Further, during his second year at Westlake, Kreil was voted teacher of the year and was the school's "Star Teacher." (SMF at ¶ 8.) Although plaintiff disputes that there were no other reported problems involving defendant Kreil, he has failed to present any evidence of any other reports or complaints made about Kreil's behavior toward students before 1999. (*See* Pl. SMF at ¶ 8.)

During the plaintiff's eleventh grade year, in the fall of 1997, defendant Kreil approached him with what Kreil described as a scholarship opportunity.[2] (SMF at ¶ 9; Hackett Dep. at 27, 30, 37.) Kreil told plaintiff of a possible $100,000 scholarship sponsored by Georgia Tech, informed him that there would be several groups competing for the scholarship, and asked plaintiff if he wanted to participate in the scholarship competition. (SMF at ¶ 9.) Based on Kreil's representations about the purported scholarship program, a group of five male students, including plaintiff, was brought together to participate in the scholarship competition. (*See id.* at ¶ 10.) Plaintiff and another student were chosen

2. The evidence is in conflict concerning the actual date that Kreil first approached plaintiff about the alleged scholarship program. In his handwritten statement that he gave to school officials during the investigation into the allegations against Kreil, the plaintiff stated that the scholarship group first started in May, 1998, which would have been at the end of the plaintiff's junior year. (*See* Hackett Dep., Ex. 2.) During his deposition, however, the plaintiff stated that Kreil first approached him early in the fall of his junior year, in August or September, 1997, and that the various "projects" or assignments continued throughout his junior year. (Hackett Dep. at 25, 37, 43.) Later in the deposition, the

plaintiff expressed some confusion about the actual dates, and stated that he might be wrong about when some of the events happened. (*See id.* at 86, 97–98.)

Moreover, in the affidavit he submitted in connection with his response to the defendants' Motion for Summary Judgment, the plaintiff again stated that he was first approached by Kreil in the fall of his junior year, in August or September, 1997. (Hackett Aff. at ¶ 2.) Accordingly, although the evidence is clearly in conflict concerning the specific time frame of the events at issue, the Court will assume for the purpose of this discussion that Kreil first approached the plaintiff in the fall of 1997.

as the group leaders. (Hackett Dep. at 26, 31.) Plaintiff was told not to discuss the scholarship program with any other teachers or administrators at the school and was told that the scholarship was only for specially chosen students and that no one else needed to know about it. (SMF at ¶ 10.) Kreil presented the plaintiff and the other members of the group with materials indicating that the program was sponsored by the Morgan Scholarship Fund, although, in reality, there was no such fund and no scholarship. Instead, the entire fictitious program had been created by defendant Kreil.[3] (Id.)

The first project that Kreil assigned to the group as part of the alleged scholarship program involved a study of metabolism. (Hackett Dep. at 33.) The group was told to keep a logbook of their daily activities and they were asked to conduct research, which was usually done at Kreil's home. (Id. at 33–36.) According to plaintiff, Kreil told the group that "Robert," the person whom Kreil claimed was his contact person at the scholarship program, insisted that the group conduct their research at Kreil's house, because the group received more points for their work when it was done with Kreil. (Id. at 33, 37.) The first project took the group approximately two months to complete, during which time they went to Kreil's house an average of once or twice per week. (Id. at 43, 51.) Plaintiff told his mother that he was participating in a scholarship program, but he did not tell her specifically what was involved in the project, nor did he tell her that he was doing most of the work on the project at Kreil's home. (Id. at 43–45.)

The second project that Kreil assigned to the group involved learning about and counting the vertebrae in the spinal column. (SMF at ¶ 15.) Specifically, the group was told that they needed to know how to count the vertebrae starting from the neck all the way down the back. (Id.) This project was also done at Kreil's home, and Kreil again gave the group material for the project that indicated that it was from the Morgan Scholarship Fund. (Id.) During this second project, Kreil demonstrated how to count the vertebrae in the back by pulling up some of the students' shirts and demonstrating. (Id. at ¶ 16.) Plaintiff thought that Kreil's behavior was inappropriate, although Kreil did not touch the plaintiff and did not physically count the plaintiff's vertebrae at that time. (Id.) Kreil attempted to touch plaintiff in order to count his vertebrae, but plaintiff, as well as other students, refused to allow him to do so. (Id. at ¶ 17; Hackett Dep. at 57–58.)

Shortly after plaintiff and the other students refused to allow Kreil to touch him for the professed purpose of counting his vertebrae, in or around December, 1997, Kreil told the group that their participation in the scholarship program was over, because they failed to complete their assignment. (SMF at ¶ 18.) Later, however, Kreil told the group that the person in charge of the scholarship fund had given the group a second chance and, therefore, they would be allowed to participate further in the program. (Id.)

In or around January, 1998, when the plaintiff returned to school after the winter break, he was informed by Kreil that he had to "qualify" as the group leader to participate further in the scholarship program.[4] (Hackett Dep. at 68–69.) As part

---

3. Kreil admitted during his deposition that the "Morgan corporation" did not exist and that he created, on his personal computer, all the documents reflecting that the scholarship was sponsored by the Morgan Scholarship Fund. (Kreil Dep. at 124, 161–162.)

4. The Court notes again that the evidence is in conflict concerning the exact dates that all

of the "qualification" process, the plaintiff was told he had to go to Kreil's house to participate. (*Id.* at 70.) After plaintiff arrived at Kreil's house, which was on a Thursday evening, Kreil told him that the people who would be doing the project would be arriving an hour later. (*Id.*) Kreil told him that a male doctor and/or a female doctor would come into the bedroom where the plaintiff was waiting, and that plaintiff would be blindfolded. (*Id.*) Then each doctor would touch the plaintiff and, afterwards, the plaintiff would be asked to guess the sex of each doctor who touched him. (*Id.*) Although the plaintiff was shocked when Kreil described the "qualification" process, he did not say anything to Kreil because he was alone at Kreil's house in Woodstock, Georgia, many miles from his own home. (*See id.* at 71.)

While the plaintiff was with Kreil in a back room of his house, the doorbell rang, but plaintiff never met any of the alleged "doctors" who were purportedly taking part in the "qualification" process. (*Id.* at 73.) Kreil told plaintiff to go into the bedroom and to put a towel over his eyes as a blindfold. (*Id.* at 74–75.) After there was a knock at the door, a person entered the room and proceeded to touch the plaintiff, although the plaintiff never removed the blindfold and thus did not see the person who touched him. As the procedure was done in complete silence, the plaintiff did not hear any voices. (*Id.* at 75.)

The plaintiff described this "qualification" procedure as follows:

> They would go down the back of my neck and go all the way down to my— like my calf and then come around the front part like up my shin to my knee, then to my midsection all the way up to

my chest. And then they would do it with my shirt on and then just like my boxer shorts and a T-shirt and then the last time completely nude.

(Hackett Dep. at 76.) Plaintiff's genitals were touched during this procedure. (*Id.*) Plaintiff stated that the entire procedure was repeated three times, with three different knocks on the door, and he would put his clothes back on in between each incident. (*Id.* at 74–75.) Although he was told that there were three different people participating, he never heard any voices, never heard anyone enter or leave the house, never heard any cars arriving or leaving. (*Id.* at 77.) The entire incident lasted about ten to fifteen minutes. (*Id.* at 75.) Afterwards, Kreil instructed him to write down on a piece of paper the gender of each person who touched him. (*Id.* at 74.)

After the "qualification procedure," the plaintiff spent the night at Kreil's house and slept in a guest bedroom across the hall from Kreil. (*Id.* at 79.) Kreil asked the plaintiff to sleep in his bedroom, but the plaintiff declined to do so. (*Id.*) Although the plaintiff states that he was very upset after the incident, and suspected that Kreil himself was the only person who had been doing the touching, he said nothing to Kreil because

> I didn't feel comfortable. I didn't know what was going on. I was in his household not knowing what could happen to me, and I was just terrified. But I couldn't say anything because I knowed that I was in Woodstock where I couldn't reach anyone or what could happen to me.

(*Id.* at 77, 80.) Plaintiff never reported this incident to his parents, any teachers

---

these events took place. (*See* note 1, *supra.*) Plaintiff stated adamantly during his deposition, however, that he remembers very clearly that this "qualification" procedure took place

in January, 1998, soon after he had returned from the winter break during his junior year at Westlake High School. (Hackett Dep. at 68–69.)

or administrators at Westlake High School or anyone else, until the school district interviewed the plaintiff in connection with an investigation into allegations made by another student against Kreil in the spring of 1999. (SMF at ¶ 21; Hackett Dep. at 133, 170.)

After the "qualification" procedure, the plaintiff continued to work on various "projects" with Kreil through the fall of his senior year and went to Kreil's house on at least a few occasions, but there were no further incidents of inappropriate touching that the plaintiff could recall. (Hackett Dep. at 81–85.) The plaintiff never spent the night at Kreil's house again after the "qualification" procedure, and the last time he recalled being at Kreil's house was in late 1998, in the fall of his senior year. (*Id.* at 86.)

In March, 1999, during the spring of plaintiff's senior year at Westlake, a Westlake student, not plaintiff, reported having problems with defendant Kreil to one of the school's counselors. (SMF at ¶ 23.) This student told the counselor, the assistant principal, and the principal of Westlake about the bogus scholarship program and the inappropriate touching done by Kreil. (*Id.*) Upon learning of these allegations, defendant Marquis Jones, the principal of Westlake High School, called the school district's central office and spoke with Dan Cochran, Executive Director of Personnel. (*Id.*) Cochran told Jones to get Kreil out of his class and have him wait for Cochran to arrive at the school. (*Id.*) Cochran arrived at the school within thirty minutes, spoke to Kreil and reassigned him to his home pending further investigation into the allegations against him. (*Id.*)

The school district began an investigation into the allegations against Kreil, but, within ten days, Kreil submitted his letter of resignation. (*Id.* at ¶ 24.) The school district continued its investigation and made a report to the Georgia Professional Standards Commission, the body that oversees teacher certification. (*Id.*) Furthermore, at some point during the investigation, the Cherokee County Police Department became involved, because Kreil resided in Cherokee County and most of the allegations concerned activities that had taken place at Kreil's home. (*Id.*) The police investigation resulted in criminal charges being filed against Kreil. (*Id.*) Ultimately, Kreil pled guilty to three of the six charges filed against him, and is currently serving out his sentence at Arrendale State Prison in Alto, Georgia. (*Id.*)

Plaintiff filed the Complaint in the instant action on January 26, 2001 against the Fulton County School Board,[5] Marquis Jones, individually and in his official capacity as Principal of Westlake High School, and William Kreil, individually and in his official capacity as a former teacher at Westlake High School. Plaintiff has asserted two separate federal claims under Title IX and Section 1983, and various state law claims against the defendants.

On November 30, 2001, plaintiff filed a partial Motion for Summary Judgment [34] against defendant Kreil on plaintiff's state law claims of assault and battery, intentional infliction of emotional distress, and false imprisonment. On that same day, the Fulton County School District and defendant Jones (the "School District defendants") jointly filed a Motion for summary judgment [35] on all of plaintiff's claims against them. Both of these motions are currently pending before the Court, along with a Motion to Strike Affi-

5. The plaintiff later filed an Amended Complaint substituting Fulton County School District as the proper party-defendant in place of the Fulton County School Board. (*See* Amended Complaint [21], filed May 21, 2001.)

davits [44] filed by the School District defendants.

### DISCUSSION

#### I. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence, including affidavit and deposition testimony, answers to interrogatories, and other such evidence, designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party,

*Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be *no genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

#### II. *Motion to Strike*

In support of his response to defendants' Motion for Summary Judgment, plaintiff has submitted affidavits from himself and from Rosetta Riddle, the mother of another student involved in the bogus scholarship program. The School District defendants have filed a Notice of Objection and Motion to Strike [44] these two affidavits. They argue that plaintiff's affidavit direct-

ly contradicts his deposition testimony, and must therefore be disregarded by the Court, and that Riddle's Affidavit contains information not based on personal knowledge but based on hearsay and speculation.

Defendants first argue that the plaintiff's affidavit should be struck from the record because it contradicts his earlier deposition testimony regarding the specific dates that the events at issue in this action took place. As noted above, the plaintiff's testimony concerning the dates on which the events happened is in conflict and, during his deposition, he became quite confused about some of the relevant dates. (*See* note 1, *supra.*) Plaintiff initially stated that he was first approached by Kreil in the fall of his junior year, in August or September, 1997, and the "qualification" procedure took place shortly after he returned from the winter break, in January, 1998. (Hackett Dep. at 25, 37, 43, 68–69.)

Later in the deposition, the plaintiff was confronted with his handwritten statement that he gave to school officials during the investigation into the allegations against Kreil, in which the plaintiff stated that the scholarship group first started in May, 1998, which would have been at the end of the plaintiff's junior year. (*See* Hackett Dep., Ex. 2.) The plaintiff then expressed confusion about the actual dates and stated that he might be wrong about when some of the events happened. (*See id.* at 96–98.) Thus, far from being "clear and unambiguous" testimony, the plaintiff's deposition testimony is not at all clear about the dates at issue. At one point, he claimed that the dates in his written statement were wrong, and then, a few minutes later, he claimed that the dates in his written statement were actually correct and his earlier deposition testimony was wrong. (*Id.* at 96, 98.) Complicating matters, the attorney questioning the plaintiff became

confused about the relevant dates as well, and placed some of the events in late 1999, which would have been after the plaintiff had graduated from Westlake. (*See id.* at 86.)

In his affidavit submitted in connection with his response to Defendants' Motion for Summary Judgment, the plaintiff states again that Kreil first approached him about the bogus scholarship program in the fall of his junior year, in August or September, 1997, and that the "projects" continued throughout his junior year. (Hackett Aff. at ¶¶ 2–6.) Defendants argue that this affidavit contradicts his earlier deposition testimony and thus should be struck from the record as a "sham" affidavit. The Court concludes that, contrary to defendants' argument, plaintiff's affidavit is consistent with much of plaintiff's deposition testimony. It was only when the plaintiff was asked to explain the discrepancy between his deposition testimony and his earlier written statement that plaintiff expressed confusion over the dates at issue.

In any event, defendants have failed to explain how plaintiff's confusion over the specific dates at issue are at all material to the issues in this action, so as to make the affidavit a "sham" attempt to create a genuine issue of fact. Whether Kreil first approached the plaintiff in the fall of 1997 or the spring of 1998 does not affect the issue of defendants' liability. It is undisputed that Kreil created a fictitious scholarship program in order to lure the plaintiff and other students to his home, where Kreil took advantage of plaintiff's trust by tricking and fondling the young man. Whether he did so in January of 1998, in May of 1998 or on another date does not appear to be material to the resolution of the pending motions for summary judgment. Accordingly, defendants' Motion to Strike [44] is **DENIED** with respect to the plaintiff's affidavit.

■ Defendants next argue that the affidavit of Rosetta Riddle should be struck from the record because it does not meet the standards of Rule 56(e). Defendants argue that Riddle's affidavit contains information clearly not based on Riddle's personal knowledge and instead based on hearsay and speculation.

Rule 56(e) states, in relevant part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

FED. R. CIV. P. 56(E). In her affidavit, Riddle states that it was her "understanding" and her "impression" that Kreil's activities with respect to the fictitious scholarship program were conducted through the school and that it was further her "understanding" that a group of students complained to Principal Jones about their treatment in Kreil's class. (Riddle Aff. at ¶¶ 10–11.) Defendants argue that Riddle's "understanding" and "impression" of events in which she did not actively participate are clearly not based on her personal knowledge and are based on speculation and hearsay.

Defendants are correct that the Court may consider only admissible evidence when deciding a summary judgment motion. Moreover, the Court agrees with defendants that some of the events described in Riddle's affidavit could not be based on her personal knowledge, as she did not participate in the events nor was she present when they occurred. In any event, although the affidavit at issue here does appear to contain at least some information based on hearsay that would be inadmissible at trial, the Court has reviewed the affidavit and has concluded that none of the purported evidence contained therein is material to the resolution of the pending motions. Furthermore, much of Riddle's affidavit is merely cumulative of other evidence in the record. Accordingly, the Court will not strike Riddle's affidavit from the record, but will consider only those portions of the affidavit containing material information that is based on the affiant's personal knowledge.

Accordingly, defendants' Motion to Strike the Affidavits of Melvin Hackett and Rosetta Riddle [44] is **DENIED**.

### III. *Title IX*

■ Plaintiff's first claim is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"). Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." · 20 U.S.C. § 1681(a). Plaintiff has brought this claim solely against defendant Fulton County School District ("FCSD") as the education program that is the recipient of federal funds.[6] (Amended Cpt. [21]

---

6. To the extent that plaintiff intended to assert a claim under Title IX against Jones or Kreil, those claims would be subject to dismissal, as actions under Title IX may not be maintained against an individual. *See generally Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.1988); *see also Does v. Covington County Sch. Bd. of Educ.*, 930 F.Supp. 554, 566 (M.D.Ala.1996) ("Title IX actions may only be brought against an educational institution or entity, not an individual acting as an adminis-trator or employee of the institution or entity.") (citations omitted); *Bowers v. Baylor Univ.*, 862 F.Supp. 142, 146 (W.D.Tex.1994) ("[T]he court is of the opinion that extending [Title IX's] reach to cover individual defendants would amount to a substantive change . . . ."); *Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1577 (N.D.Ca.1993) (holding that "individuals may not be held personally liable under Title IX.").

at ¶ 36.) Plaintiff alleges that he was subjected to discrimination and harassment because of his sex by defendant Kreil and that the FCSD is liable under Title IX for failing to prevent such harassment.

■■■ The Supreme Court has held that Title IX is enforceable through an implied right of private action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Furthermore, the Supreme Court has held unequivocally that Title IX places on public school systems the duty not to discriminate against students on the basis of sex and the duty to protect students from intentional discrimination, including sexual harassment or abuse, by teachers. *Franklin v. Gwinnett County Public Sch.*, 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Accordingly, a student alleging that a school district has violated Title IX may recover monetary damages against the school district under Title IX. *Id.* at 76, 112 S.Ct. 1028.

■■■ Nevertheless, although a school district may be liable under Title IX for sexual harassment or abuse by a teacher against a student, in order to hold the school district liable, the plaintiff must establish that an official of the school district with authority to institute corrective measures on the district's behalf had *actual notice* of the teacher's misconduct and thereafter was *deliberately indifferent* to that conduct. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). School districts are not liable for the misconduct of teachers under a theory of *respondeat superior* or constructive notice. *Id.* at 285, 118 S.Ct. 1989.

The Supreme Court reasoned that Title IX required that a school district have *actual* notice of the misconduct and be given an opportunity to remedy the situation before any administrative action may be taken against it. Similarly, the district must be afforded the same opportunity before monetary damages may be assessed against it as well. *Id.* at 289–290, 118 S.Ct. 1989.

Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290, 118 S.Ct. 1989 (citations omitted).

■■ Based on the express holding in *Gebser*, the Court concludes that plaintiff has failed to present sufficient evidence to establish that FCSD is liable to plaintiff under Title IX for the misconduct of defendant Kreil. Therefore, FCSD is entitled to summary judgment on plaintiff's claim in Count One of the Complaint. A review of the facts in *Gebser* illustrates that plaintiff in the instant action has failed to surmount this burden of establishing *actual notice* of Kreil's misconduct by an appropriate person at FCSD.

In *Gebser*, the plaintiff had been an eighth grade student at a middle school in the defendant school district in the spring of 1991 when she joined a book discussion group led by a male teacher at the high

school. *Id.* at 277, 118 S.Ct. 1989. During the book discussion sessions, the teacher often made sexually suggestive comments to the students. *Id.* Later that fall, the plaintiff entered high school and was assigned to classes taught by the same teacher who had led the book discussion sessions. *Id.* at 277–278, 118 S.Ct. 1989. He continued to make inappropriate remarks to the students in his class, and began to direct some of his more suggestive comments to the plaintiff. *Id.* at 278, 118 S.Ct. 1989. In the spring of 1992, the teacher initiated sexual contact with the plaintiff and the two had sexual intercourse on a number of occasions for the remainder of the school year, through the summer, and into the following school year. *Id.*

Although the plaintiff never reported the relationship to school officials, in October, 1992, the parents of other students complained to the high school principal about the teacher's sexually inappropriate comments made during class. *Id.* The principal met with the teacher, who denied making offensive remarks, but apologized to the parents and said it would not happen again. *Id.* The principal advised the teacher to be more careful about his classroom comments and, although the principal told the school guidance counselor about the meeting, he did not report the parents' complaint to the school district's superintendent. *Id.*

A few months later, in January, 1993, a police officer discovered the teacher and the plaintiff having sex and arrested the teacher. *Id.* The school district terminated the teacher's employment and his teaching certificate was subsequently revoked by the Texas Education Agency. *Id.* Thereafter, the plaintiff filed a private action for damages against the school district for failing to· prevent the teacher's conduct toward her, pursuant to both Title IX and Section 1983, as well as state law

claims of negligence. *Id.* The district court granted summary judgment to the school district on all of plaintiff's federal claims, and remanded the claims against the teacher to state court. *Id.* at 279, 118 S.Ct. 1989. The district court reasoned that Title IX was enacted to counter *policies* of sex discrimination, and the school district could not be found to have a policy of discrimination unless it had *actual* notice of the misconduct by the individual teacher and failed to remedy the problem. *Id.*

The plaintiff appealed the grant of summary judgment to the school district on the Title IX claim, and both the Fifth Circuit Court of Appeals and the Supreme Court affirmed the decision of the district court that actual notice was required before a school district would be liable to a student for sexual harassment or sexual misconduct by a teacher. *Id.* As the Fifth Circuit reasoned, if school districts were to be held vicariously liable for the misconduct of teachers under a theory that the teacher is aided in accomplishing the misconduct "by the existence of the agency relation," then the application of that principle would result in school district liability in essentially every case of teacher-student harassment. *Id.* at 280, 118 S.Ct. 1989; *see Doe v. Lago Vista Indep. Sch. Dist.,* 106 F.3d 1223, 1225–1226 (5th Cir.1997).

The Eleventh Circuit has provided further guidance on the appropriate standard for holding school districts liable for the sexual misconduct of a teacher toward a student after *Gebser.* In *Davis v. DeKalb County School District,* 233 F.3d 1367 (11th Cir.2000), the Eleventh Circuit affirmed the district court's granting of summary judgment to a school district on claims brought by three students pursuant to Title IX and Section 1983. The three students alleged that they had been victims of sexual molestation by the same

teacher at Knollwood Elementary School in DeKalb County and alleged that the school district and principal of Knollwood had been deliberately indifferent to their rights, because another student had previously complained that the teacher had touched her inappropriately, but the principal had failed to take any action against the teacher. *Id.* at 1372–1373. The other student had complained that she had felt the teacher "touch [her] behind" during a touch football game, and that later he had tried to touch her again at a water fountain after the game. *Id.*

The district court granted summary judgment to the school district and principal, and the Eleventh Circuit affirmed, finding that the complaint by the other student had not provided actual notice to the principal that the teacher was sexually molesting the plaintiffs. *Id.* at 1373 ("We agree with the district court that a complaint of an incidental touching during an athletic event and a perceived imminent touching could not, as a matter of law, apprise Defendants to the possibility that [the teacher] was sexually molesting Plaintiffs."). Moreover, the court held that the principal had not acted with deliberate indifference when confronted with the other student's complaint and had promptly investigated the incident and forbade the teacher from being alone with the complaining student or any other female student. *Id.* at 1373–1374.

Based on the holdings in *Gebser* and *Davis,* the Court must conclude that plaintiff in the instant action has failed to present sufficient evidence that an appropriate person at FCSD had actual notice that Kreil was behaving inappropriately with plaintiff or any other student, and failed to remedy the problem. Indeed, the undisputed evidence reflects that immediately after receiving a complaint from a student that Kreil was conducting a bogus scholarship program and behaving inappropriate-ly towards students, Principal Jones called Dan Cochran at the FCSD central office, who advised Jones to remove Kreil from the classroom and have him wait for Cochran to arrive at the school. Cochran arrived at Westlake shortly thereafter, and reassigned Kreil to his home pending an investigation into the allegations. Kreil resigned a few days later and was subsequently prosecuted for his conduct towards plaintiff and the other students involved in the fictitious scholarship program.

It is undisputed that the plaintiff never told anyone about the "qualification" procedure that he endured at Kreil's house until he was questioned during the course of the investigation into another student's complaints about Kreil in the spring of 1999. Nevertheless, the plaintiff argues that defendant Jones, the principal of Westlake High School, had actual notice that Kreil was sexually harassing the plaintiff before the other student complained in March, 1999. He further argues that defendant Jones was an appropriate person with authority to act on behalf of the school district. Plaintiff contends that the school district had actual notice of Kreil's propensity for misconduct based on two events. First, plaintiff contends that the school district was on notice because another student had previously complained that Kreil had asked her to relay an inappropriate personal message to another teacher at the school, thus providing constructive notice to the school district that Kreil had a propensity to harass younger males. Second, plaintiff contends that Jones had actual notice of Kreil's misconduct because he had been informed that students were meeting at Kreil's house for an alleged "scholarship program," although the scholarship program had not been approved by the school, yet Jones failed to investigate further the nature of this "scholarship program."

Defendants contend that Jones, as principal of Westlake High School, did not have the authority to fire Kreil and, thus, could not be considered an "appropriate person" under the Supreme Court's holding in *Gebser*. The Court will assume, *arguendo*, without deciding, as the Eleventh Circuit assumed in *Davis*, that a principal could be considered a supervisory official with authority to take corrective action on behalf of the school district. *See Davis*, 233 F.3d at 1372. The Court nevertheless concludes that neither of these incidents proffered by plaintiff was sufficient to put Jones or any other official with the school district on actual notice that Kreil was sexually harassing the plaintiff or any other student.

First, the Court addresses the contention that the previous complaint about Kreil and his alleged involvement with Todd Green put the school district on actual notice that Kreil had a propensity to commit sexual misconduct against students. Although the evidence is in conflict regarding exactly what occurred between Kreil and Green, it is undisputed that, in June, 1997, a student reported an incident in which Kreil asked her to relay a message to another teacher at Westlake High School, Todd Green.[7] Viewing the evidence in the light most favorable to plaintiff, the evidence reflects that Kreil told the student to tell Green that if Green did not come to Kreil's house, Kreil was going to commit suicide. (*See* Souders Dep. at 13.) Green was approximately 21 years old at the time, and had just graduated from college, while Kreil was approximately 46 years old. (*Id.* at 14; *see* Kreil Dep. at 3.)

The school district assigned Linda Souders, Director of Procurement and Certification, to investigate this incident, and she discovered that Kreil and Green were involved in some sort of personal relationship, but Green was too embarrassed to reveal the details of the relationship to Souders. (Souders Dep. at 13.) He said that it involved some "special project" that Kreil told him he would be paid to participate in and that the project involved medicines and reactions. (*Id.*) Souders reported the results of her investigation to Dr. Ernest Lavender, the Assistant Superintendent for Human Resources, who told her to ask Green if he wanted to file any formal complaint against Kreil. Green responded that he did not wish to do so. (*Id.* at 14–15.) Souders later spoke with Kreil about the incident to inform him of the report made about it, but there is no evidence that any formal action was taken against Kreil by the school district. (*See id.* at 18–19.)

The Court rejects plaintiff's contention that this incident placed the school district on actual notice that Kreil had a propensity to commit sexual misconduct against students. First, Todd Green was a teacher, not a student. Although the evidence reflects that Green was considerably younger than Kreil and, at the time of the incident in question, was just out of college, it is still undisputed that Green was a teacher, not a student. Thus, even if the evidence could be construed as placing the school district on notice that there was a peculiar relationship between Kriel and Green, a teacher's harassment of another teacher can not be considered sufficient to put the principal on notice that the teacher may be committing sexual misconduct against *students*. *Cf. Gebser*, 524 U.S. at 291, 118 S.Ct. 1989 (the principal's notice of a teacher's sexually suggestive comments to students in class does not equate

---

**7.** It is undisputed that this incident involving Todd Green happened several months before Jones became principal of Westlake High School in November, 1997. (*See* Jones Dep. at 9–10.)

to notice that the teacher might be sexually molesting a student).

Moreover, the details of the relationship between Green and Kreil were very unclear, as Green specifically stated that he did not want to file a complaint against Kreil. Although Souders knew that something was not "kosher" about the relationship, Green refused to tell her much more about the "special project" that he and Kreil were involved in, other than that it involved medicines and reactions. (*See* Souders Dep. at 19.) Based on such limited information, the school district could not be imputed as having "actual notice" that Kreil was sexually harassing or abusing Todd Green. In sum, based on Green's refusal to file a complaint and the school's lack of knowledge of exactly what had transpired between Kreil and Green, the school district argues that there was little it could do to reprimand Kreil. Although a school district has a duty to protect its students from harassment by teachers, its obligations and responsibilities are far different with regard to a personal relationship between two adult teachers.

In addition to the complaint involving Todd Green, plaintiff further contends that Jones was placed on actual notice of Kreil's misconduct because Jones was informed that Kreil was engaged in some sort of "scholarship program" that involved bringing students to his house, yet Jones knew or should have known that the alleged scholarship program had not been approved by the school. The evidence is disputed as to the extent of Jones's knowledge about the purported scholarship program. Even viewing all evidence in the light most favorable to plaintiff, however, it reflects at most that Jones was negligent in ignoring warning signs that Kreil was involved in a scholarship program of dubious origins. Plaintiff has presented no evidence that Jones had notice that this purported "scholarship program" involved touching students inappropriately or sexual misconduct of any kind.

Plaintiff contends that Jones had knowledge of the purported scholarship program because both Kreil and Rosetta Riddle, a parent of one of the other students involved, informed Jones about the program. Kreil stated during his deposition that Jones was aware that Kreil occasionally had students meet with him in his home for various reasons, including the science fair, field trips, and other school functions. (Kreil Dep. at 168.) Kreil described his conversations with Jones about the alleged scholarship program as follows:

Q. Do you specifically recall talking to him [Jones] about the project?

A. The reason I say that is because I was there so many evenings for so many different things and I always had to go to him to get permission for the air-conditioning to be turned on in our building or in our wing later in the evening. He may have asked me, you know, what are you doing tonight, and I may have answered him that way. I didn't specifically divulge any details to him at all.

Q. But you wouldn't have been doing any of the scholarship work at the school?

A. No, but I know the night I met with the parents was in my classroom.

Q. Can you recall what you might have told him about that meeting?

A. That I'm having a meeting with the parents of kids working on the scholarship.

Q. Nothing more than that?

A. No.

Q. Would he have ever known that any of this work was done at your house?

A. Yes.

Q. He did know that work was done at your house?

A. I was in charge of the science fair. And not just these people but people would come by for computer work, things we couldn't do at the school that my computer was capable of doing and generating. A lot of times I took it home and did it and brought it back to them. Sometimes you didn't know what they wanted and you have to change it around.

Q. Did Mr. Jones know you had students at your home on occasion?

A. When we went to the Vanderbilt debate tournament—I live on the north side of town. We had to be in Nashville at 7:00 o'clock in the morning. They went home with me from school. We got up at midnight and headed for Nashville.

Q. Did that have to be approved by the administration?

A. I asked Mr. Jones. Mr. Jones said okay as long as the parents said okay....

Q. Obviously there were no permission slips or anything like that for the scholarship program?

A. No. It wasn't school related.

(Kreil Dep. at 168–170.)

Plaintiff claims that this evidence reflects that Kreil specifically informed Jones that he was bringing students to his home to work on a purported scholarship program and, therefore, Jones was on notice that Kreil was behaving improperly with students. The Court finds that Kreil's testimony is at best ambiguous with respect to whether he told Jones that he was bringing students to his home specifically for the purpose of participating in some sort of scholarship program. Viewing the facts in the light most favorable to plaintiff, however, and assuming that Kreil's testimony could be construed as placing Jones on notice that students were coming to his home in the evenings to work on the scholarship program, the Court concludes that this knowledge does not equate to actual knowledge that Kreil was committing sexual misconduct against the students.

Plaintiff has further submitted the affidavit of Rosetta Riddle, the mother of one of the other students involved in the bogus scholarship program. According to Riddle, she learned during her son's junior year at Westlake High School that Kreil had approached her son, as well as plaintiff and a few other male students interested in science and in possibly attending Georgia Tech, about a scholarship program sponsored by Georgia Tech and the National Science Foundation. (Riddle Aff. at ¶ 4.) Based upon her own investigation and research, Riddle could not find any information about the scholarship and, on an unspecified date, she allegedly approached defendant Jones "about the scholarship program and the lack of information on it.... Mr. Jones denied having any knowledge of the scholarship. He also never stated that he would inquire as to why a faculty member would conduct such a program without the school's permission and further never indicated that anything would be done to remedy the situation." (Riddle Aff. at ¶ 6.) Riddle also contends that students complained about Kreil exhibiting "favoritism" in his classroom towards certain students, although it is not clear how she would have personal knowledge of this alleged favoritism. (*See id.*)

In sum, plaintiff has presented evidence that Kreil mentioned the scholarship program to Jones on at least one occasion and that Rosetta Riddle had asked Jones for more information about the scholarship program on another occasion. The evidence is not clear as to how much information Riddle, herself, had about the bogus scholarship program, nor is the evidence

clear regarding what specific information Riddle relayed to Jones. She states merely that she "approached" him about the program and the "lack of information" about it. In any event, even assuming that Jones was aware that Kreil was bringing students to his home in connection with an alleged scholarship program, and assuming that Jones was placed on notice by Riddle that the alleged scholarship program appeared to be suspicious in some way, plaintiff has shown at most that Jones was negligent in failing to investigate further into what was going on with the alleged scholarship program.

Plaintiff, in essence, argues that Jones *should have known* that something suspicious was going on and *should have investigated further* to find out what was happening at Kreil's home during these research sessions. Obviously, in these deplorable incidents sexual misconduct by teachers, hindsight usually reveals that something more could have been done to prevent it or that perhaps clues were ignored or warning signs were not heeded. Second guessing is inevitable. Under the Supreme Court's very clear holding in *Gebser,* however, it is not enough for the plaintiff to establish that Jones should have known, or could have known, or that he ignored warning signs, or that he simply was not diligent enough in investigating what appeared to be highly suspicious activity on the part of Kreil. The Supreme Court explicitly rejected the notion that constructive notice is sufficient to hold a school district liable under Title IX for the sexual misconduct of a teacher. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 285, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Plaintiff must establish that Jones, or another appropriate person with authority in the school district, had *actual notice* that Kreil was committing sexual harassment or abuse of a student and failed to remedy the problem. Plaintiff has not presented any evidence that Jones had such knowledge, and the FCSD is thus entitled to summary judgment on plaintiff's claim *for* damages pursuant to Title IX.

Accordingly, defendants' Motion for Summary Judgment [35] is **GRANTED** with respect to plaintiff's claim brought under Title IX against the Fulton County School District, which is Count One of the Complaint.

## IV. *Section 1983*

Plaintiff's second claim is brought against all defendants pursuant to 42 U.S.C. § 1983 ("Section 1983"). Plaintiff claims that defendant Kreil, acting under color of state law, violated his constitutional rights, and that Principal Jones and the Fulton County School District were aware of defendant Kreil's improper conduct towards students but acted with deliberate indifference to the plaintiff's rights in failing to prevent Kreil's conduct toward the plaintiff. Plaintiff seeks damages from all defendants for their violation of his constitutional and statutory rights.

42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Thus, in order to establish a claim under Section 1983, plaintiff must show a violation of a right secured by the Constitution of the United States, and also that the deprivation of that right was committed by a person acting under color of state law.

*Cummings v. DeKalb County*, 24 F.3d 1349 (11th Cir.1994); *see also Graham v. Connor*, 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (" § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

Plaintiff alleges that defendant Kreil, acting under color of state law, violated his substantive due process rights under the Due Process Clause of the Fourteenth Amendment when he sexually abused plaintiff, and that the School District defendants are also liable under Section 1983 because they acted with deliberate indifference in failing to prevent Kreil's violation of the plaintiff's rights.

## A. Does Plaintiff's Title IX Claim Preempt a Section 1983 Claim?

Defendants first argue that plaintiff may not pursue his separate claims under Title IX and Section 1983 simultaneously. Defendants contend that plaintiff seeks to enforce his rights directly under Title IX, but only indirectly under Section 1983. Citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), defendants argue that Title IX preempts plaintiff's claim under Section 1983, which is based on the same allegations of misconduct. The *National Sea Clammers* doctrine precludes plaintiffs from bringing private actions pursuant to Section 1983 to enforce rights under specific federal statutes that have their own comprehensive enforcement mechanisms. *Id.* at 20–21, 101 S.Ct. 2615; *see also Lillard v. Shelby County Bd. Educ.*, 76 F.3d 716, 722 (6th Cir.1996). Defendants argue that, under this doctrine, plaintiff may not maintain one claim under Title IX directly and a separate claim under Section 1983 to enforce his rights under Title IX.

Defendants are correct that, pursuant to the *National Sea Clammers* doctrine, the plaintiff may not maintain a separate claim under Section 1983 to enforce the specific statutory rights provided by Title IX. *See Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 758 (2d Cir.1998). Plaintiff, however, asserts that he has brought his Section 1983 claim to enforce his constitutional rights under the Fourteenth Amendment, not to enforce his statutory rights under Title IX. Plaintiff argues that Kreil violated his liberty interest in his bodily integrity, as protected by the substantive prong of the Due Process Clause of the Fourteenth Amendment.

Several federal courts have recognized a "liberty" interest by a student in his "bodily integrity," such that when a state actor, such as a public school teacher, violates that "bodily integrity," a claim under the Fourteenth Amendment arises. *See, e.g., Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir.1999) (minor student who had consensual sexual relations with her teacher stated a substantive Due Process claim to be free from bodily harm and sexual molestation); *Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir.1998) (rape by police officer of woman stopped for traffic violation violated her Due Process right to intimate bodily integrity); *Plumeau v. Sch. Dist. # 40*, 130 F.3d 432, 438 (9th Cir.1997) (janitor whose touching of elementary school children constituted criminal sexual abuse also violated the children's Due Process right to bodily integrity); *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir.1996) (where a 15 year old student had consensual sexual intercourse with her teacher, the panel noted that "every court of appeals that has had the opportunity to consider the issue has logically recognized that the right to be free from sexual abuse at the hands of a public school teacher is

clearly protected by the Due Process Clause of the Fourteenth Amendment"); *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 451 (5th Cir.1994) (minor student who was had consensual sexual intercourse with her teacher "clearly was deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment"); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir.1989) (student's "right to bodily integrity under the Due Process Clause [encompasses] a student's right to be free from sexual assaults by his or her teachers.").

Furthermore, a *constitutional* liberty interest in "bodily integrity," found by courts to inhere in the Fourteenth Amendment is presumably separate and distinct from the *statutory* right to be free from sex discrimination in federal programs provided by Title IX. *See Lillard*, 76 F.3d 716, 723 (6th Cir.1996); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) ("Our decision [regarding Title IX] does not affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in his individual capacity under state law or under 42 U.S.C. § 1983.").

Thus, the Court will assume that the statutory right to be free from discrimination on the basis of sex while participating in a federally funded program and the constitutional right to be free from a violation of one's bodily integrity at the hands of a state actor are two distinct rights, even if the same conduct is asserted to support a claim on both grounds. Accordingly, the Court assumes [8] that a plaintiff who has asserted a claim under Title IX is not necessarily precluded from also asserting a claim under Section 1983 for the deprivation of a constitutional right.

Finally, as noted above, plaintiff's Title IX claim is asserted solely against FCSD, while his Section 1983 claim is asserted against not only FCSD, but also against Jones and Kreil, in their individual capacities. Defendants have not presented any authority that would require dismissal of plaintiff's Section 1983 claims against Jones or Kreil, when he has not, and indeed, could not, pursue claims against them individually under Title IX.

Accordingly, the Court rejects defendants' argument that plaintiff's claim under Section 1983 is preempted because he has asserted a separate claim against the School District under Title IX. For purposes of this litigation, therefore, this Court assumes that plaintiff may therefore pursue a separate claim under Section 1983 for a violation of his liberty interest in his bodily integrity under the Due Pro-

---

8. This Court may assume this matter without absolutely deciding it, because, as noted *infra*, it is clear that the individual defendants who could be liable under a Section 1983 claim, Kreil and Jones, can have no liability for a Title IX claim, which claim can, by statute, be made only against the school district, not against individual employees. Thus, plaintiff can make no Title IX claim against these individuals and, as to them, there is no question of preemption. While the question whether a plaintiff can maintain both a Title IX and a constitutional liberty claim, based on the same conduct, is conceivably ripe as to the defendant FCSD, the Court does not ultimately have to reach this question because it

has ruled, *supra* and *infra*, that the FCSD is ultimately not liable under either theory. Thus, the Court can leave, for another day, the question whether a plaintiff can be required to elect which claim he seeks to pursue, if a defendant shows that the elements of a Title IX and a liberty claim are essentially the same with regard to a claim of sexual abuse by a school teacher. *Cf. Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (in a criminal case, the test to determine whether two counts of an indictment set out two different offenses, or only one, is whether each statutory provision requires proof of a fact that the other does not).

cess Clause of the Fourteenth Amendment.

### B. *Was Defendant Kreil Acting under Color of State Law?*

As noted above, in order to establish a violation of his constitutional rights to bodily integrity, the plaintiff must show not only the deprivation of a specific constitutional right, but also that defendant Kreil was acting under color of state law when he committed the acts against plaintiff that gave rise to this action. *See Griffin v. City of Opa–Locka*, 261 F.3d 1295 (11th Cir.2001); *Almand v. DeKalb County*, 103 F.3d 1510, 1513 (11th Cir. 1997). Defendants argue that Kreil was not acting under color of state law when he committed the acts against plaintiff because it is undisputed that the acts occurred in Kreil's home, in the evening, and that the bogus scholarship program created by Kreil to lure students to his home was not related to any school activity, but was purely a personal pursuit by Kreil. Plaintiff counters that Kreil was a public school teacher, and thus a state employee, and that he used his position as a public school teacher to "lend validity to the bogus scholarship program he used as a mechanism for abusing his students." (Pl. Resp. Br. [38] at 10.)

Kreil's status as a public school teacher does not convert every potentially tortious act he commits into a constitutional violation, for acts of a state officer committed solely in furtherance of his own personal pursuits are not acts under color of state law. *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1186 (10th Cir. 1990) (citing *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state. *Griffin*, 261 F.3d at 1303; *Almand*, 103 F.3d at 1513. The dispositive issue is

whether the public employee was acting pursuant to the power he possessed by state authority or instead was acting only as a private individual. *Griffin*, 261 F.3d at 1303 (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1523 (11th Cir.1995)). Furthermore, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of law when he abuses the position given to him by the State." *Griffin*, 261 F.3d at 1303 (citing *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)).

> Whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing. *Almand*, 103 F.3d at 1515. It is only through a process of "sifting facts and weighing circumstances" that we arrive at a correct determination. *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir.2000).

*Griffin*, 261 F.3d at 1303.

In *Griffin v. City of Opa–Locka*, 261 F.3d 1295 (11th Cir.2001), the plaintiff was not a high school student, but a city employee who alleged that she had been raped by the City Manager in her home one evening after he had driven her home following a Rotary Club meeting. *Id.* at 1299–1300. She brought an action under Section 1983 against the city and the City Manager, alleging that the City Manager acted under color of state law when he sexually harassed her in the workplace and raped her in her home. *Id.* at 1300. The district court held that the City Manager had acted under color of state law, and the Eleventh Circuit affirmed that holding. *Id.* at 1305.

> Neal's official interactions with Griffin as her boss during and after work hours, his continual sexual harassment of her during those interactions, and the ultimate sexual assault constitute an indivis-

ible, ongoing series of events.... That Griffin had already resigned from her position at the City at the time of the assault does not change our conclusion that Neal used and abused his authority to perpetrate against Griffin sexual harassment and assault.

*Id.* at 1305, n. 8.

Under this standard, it is clear that a public school teacher acts under color of state law when he commits an act of assault or abuse against a student in his class, on school property and during the school day when the student is under the teacher's control or authority. *See, e.g., Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 722 (3rd Cir.1989) (teacher and band leader acted under color of state law when he committed acts of sexual abuse against student in the band on school property and during school hours). Indeed, many cases involving sexual abuse by a public school teacher against a student assume, without any discussion, that the teacher was a "state actor" for the purpose of a Section 1983 claim. *See, e.g., P.H. v. Sch. Dist. of Kansas City,* 265 F.3d 653, 657 (8th Cir.2001) (assumes without discussion that a high school teacher who engaged in two-year sexual relationship with student, and committed sexual acts at school during school hours, as well as at hotels and other places, was a state actor for the purpose of a Section 1983 claim); *Doe v. Claiborne County,* 103 F.3d 495, 506–507 (6th Cir.1996) (referring to a high school teacher and basketball coach who began sexually abusing a fourteen year-old freshman who was the team's scorekeeper during bus trips to basketball games and who later continued the sexual relationship, both on and off school property, as a "state actor").

It is undisputed that Kreil was an employee of FCSD at all relevant times in this action. It is also uncontroverted that Kreil used his position as a teacher at Westlake High School to facilitate his contact with plaintiff and the other students he recruited for the bogus scholarship program. Nevertheless, it is further undisputed that the purported scholarship program had no relationship to any legitimate school activity and that Kreil's acts of misconduct toward plaintiff took place at Kreil's house, the evening, and not on school grounds during normal school hours.

When a public employee's performance of his duties merely facilitates the development of a relationship between the employee and another person, and the employee later, on his own time and independent of his official duties, commits an assault or other constitutional tort against the person, the employee is not acting under color of state law. *Griffin,* 261 F.3d at 1306. The Eleventh Circuit has not specifically addressed the parameters for determining when a public school teacher who has injured or abused a student is acting under color of state law, but it has cited with approval a decision of the Fifth Circuit that a public school teacher acts under color of state law when there is a "sufficient nexus" between the teacher's duties and his sexual misconduct toward a student. *Griffin,* 261 F.3d at 1305 (citing *Doe v. Taylor Ind. Sch. Dist.,* 15 F.3d 443, 452 n. 4 (5th Cir.1994)).

In *Doe v. Taylor Independent School District,* the Fifth Circuit held that a teacher acted under color of state law when he engaged in an ongoing sexual relationship with a fifteen year-old high school freshman, even though a significant amount of the sexual contact between them occurred after hours and off school grounds, in the teacher's home. *Doe,* 15 F.3d at 452 n. 4. In that case, however, the teacher also grabbed the plaintiff and kissed her on school property, in the school's fieldhouse, at basketball games,

and other school functions. *Id.* He also gave her notes and cards at school and awarded her "A's" in class, although he required her to do little or no work at all. *Id.* The teacher's official interactions with the student as her teacher and his sexual involvement with her "constituted an indivisible, ongoing relationship ... [that] was an abuse of power conferred by the state." *Id.* at 461 (Higginbotham, J., concurring).

Other courts using a similar "nexus" test have concluded, however, that a teacher who meets a student at school, but who does not commit the acts of sexual abuse or misconduct during a period when the teacher is actively engaged in teaching that student, does not act under color of state law. *See, e.g., Becerra v. Asher,* 105 F.3d 1042, 1047 (5th Cir.1997) (although teacher had "first befriended and shown a special interest in" the victim at school, there was no nexus between the teacher's official duties and the sexual assault when teacher molested student in the teacher's home five months after student withdrew from school); *D.T. v. Indep. Sch. Dist.,* 894 F.2d 1176, 1186–88 (10th Cir.1990) (teacher did not act under color of law when he molested students during summer vacation, when he was not officially working for the school district, and the molestation took place at his home following a fundraising activity for a basketball camp not affiliated with the school and which the victims were not required to attend as part of their school activities).

In the instant action, the evidence reflects that Kreil was the plaintiff's science teacher when all of the events at issue in this action took place. Kreil was the plaintiff's teacher before, during, and after the "qualification procedure" at Kreil's home in early 1998. Kreil approached plaintiff at school during school hours about participating in the alleged "scholarship program," and Kreil pretended that the program was related to science and

was sponsored by the National Science Foundation and Georgia Tech. Plaintiff knew at all times, however, that the scholarship program had nothing to do with his class work at school, and his participation in the alleged scholarship program was completely voluntary. (*See* Hackett Dep. at 35.) Furthermore, almost all of the research on the purported projects was conducted at Kreil's house, in the evenings after school, and plaintiff was instructed by Kreil not to discuss the project with anyone outside the group and not to tell anyone that he was doing the research at Kreil's house. (*Id.* at 36.)

These circumstances present a closer call than do some of the cited cases as to whether Kreil was acting under color of state law when he committed the acts against the plaintiff that allegedly violated the plaintiff's constitutional rights. Based on the Eleventh Circuit's holding in *Griffin,* however, the Court concludes that plaintiff has presented sufficient evidence that Kreil invoked his authority as a Westlake High School science teacher to create the opportunity to lure plaintiff to his home under the pretense of a fictitious scholarship program, where Kreil violated the plaintiff's constitutional rights. *See Griffin,* 261 F.3d at 1305 (a state employee acts under color of law when he utilizes his authority to create the opportunity to facilitate a rape or sexual assault).

Although the plaintiff was never forced to participate in the bogus scholarship program, Kreil, as his science teacher, was aware of plaintiff's interest in science and his interest in attending Georgia Tech, and he took advantage of that knowledge to entice plaintiff to Kreil's home under the pretense that a scholarship to Georgia Tech worth $100,000 was potentially available to him if he participated in the various "projects" that Kreil invented for him to do. Kreil not only had the opportunity to

meet the plaintiff as a result of his position as a Westlake high school teacher, but he also used his position as a teacher to give a stamp of legitimacy to the fictitious scholarship program that he created solely as a scheme to lure the students to his home. Indeed, it is hard to envision how anyone but plaintiff's science teacher could have persuaded plaintiff that there was a scholarship and that plaintiff would have to work on experiments with the teacher to qualify. Certainly, had a total stranger approached plaintiff with this proposition, the suggestion would have seemed ludicrous. Students do work with teachers on academic projects and, as part of their professional relationship with students, teachers do help students apply for scholarships. Accordingly, the Court concludes that Kreil was acting under color of state law when he committed the acts against the plaintiff that form the basis of this action.

## C. *Individual Liability of Defendant Kreil*

Plaintiff has asserted his claims under Section 1983 against the FCSD and defendants Jones and Kreil in both their individual and official capacities. Defendant Kreil has not moved for summary judgment on any of plaintiff's claims against him, and he admits that he did touch the plaintiff in his genital area and buttocks. (Kreil Dep. at 82, 103.) Furthermore, although the School District defendants have argued in their motion for summary judgment that Kreil's actions were not committed under color of state law, they do not otherwise dispute that the plaintiff's allegations against Kreil rise to the level of a constitutional violation. Accordingly, as neither defendant disputes plaintiff's contention that Kreil's conduct against the plaintiff, if proven by the latter, deprived the plaintiff of his right to bodily integrity under the Due Process Clause of the Fourteenth Amendment, this Court may assume that plaintiff has established a violation of a constitutional right, which is an element of his Section 1983 claim as to both defendant Kreil and defendant Jones.

Even assuming that plaintiff will be able to prove the facts needed to establish liability by Kreil individually, however, such proof will not result in an automatic finding of liability with respect to the School District or Principal Jones. The fact that a constitutional deprivation has occurred at the hands of a state actor "does not answer the separate question of which persons, apart from the immediate perpetrator, may be held liable under § 1983." *Doe v. Rains County Indep. School Dist.,* 66 F.3d 1402, 1407 (5th Cir.1995). This Court must therefore address whether the School District or Principal Jones may be held responsible to plaintiff under Section 1983 for the actions of Kreil.

## D. *Individual Liability of Defendant Jones*

Plaintiff has asserted a claim under Section 1983 against Principal Jones in both his individual and official capacities.[9] Plaintiff does not allege that defendant Jones personally participated in any of the acts that directly deprived the plaintiff of his constitutional rights. Instead, plaintiff alleges that Principal Jones is personally liable as Kreil's supervisor because, plaintiff alleges, Jones had an affirmative duty to protect the plaintiff from Kreil's actions and Jones was deliberately indifferent to

---

**9.** A suit against a public official in his or her official capacity is simply another way of suing the public entity that the official represents. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Accord-

ingly, the Court will discuss the claims against defendants Kreil and Jones in their official capacities in conjunction with its discussion of the claims against the Fulton County School District, *infra.*

the plaintiff's rights when he failed to prevent and correct Kreil's behavior.

If the individual whom a plaintiff is seeking to hold liable under a theory of supervisory liability was not present at the time that the alleged constitutional violation occurred, the standard to impose liability is "extremely rigorous." *Braddy v. Florida Dept. of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir.1998). As the Eleventh Circuit has stated:

> Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervisory official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervisory official must be obvious, flagrant, rampant, and of such continuous duration, rather than isolated occurrences.

*Id.* at 801 (citing *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990) (citations omitted)).

It is undisputed that defendant Jones was not an active participant in the actions taken against plaintiff that allegedly deprived him of his right to bodily integrity. Plaintiff argues that Jones is nevertheless personally liable in a supervisory capacity for failing to take appropriate corrective action for Kreil's violations of the plaintiff's constitutional rights. In order to establish that Jones is liable for failing to take corrective action, the plaintiff must demonstrate a history of rampant, flagrant, obvious, and continuous constitutional violations against students by Kreil or other teachers at Westlake High School that went unchecked by Jones.

In attempting to demonstrate a "history of widespread abuse" of students at Westlake High School, plaintiff points to the same evidence, described above in connection with his Title IX claim, that purportedly placed Jones on notice that Kreil was acting inappropriately towards plaintiff and other students. Plaintiff argues that the incident involving Todd Green in 1997 should have placed the School District on notice that Kreil had a propensity to commit sexual abuse of students. As the record reflects that Jones did not become Principal of Westlake until November, 1997, after Todd Green had already left the school, this allegation fails. (Jones Dep. at 9–10.)

Plaintiff argues further that Jones was informed by Rosetta Riddle, on an unspecified date, that Kreil was conducting a scholarship program that appeared suspicious and also that Kreil, himself, informed Jones that he was bringing students to his home in the evenings as part of this purported scholarship program. As discussed above, however, even viewing the evidence in the light most favorable to plaintiff, Kreil's deposition testimony is quite ambiguous with respect to what he told Jones about the alleged scholarship program. When asked if Jones knew that he was bringing students to his home in connection with the alleged scholarship program, Kreil responded that Jones knew that students had come to his home in conjunction with the science fair and before traveling to a debate tournament in Nashville. (Kreil Dep. at 168–170.) Moreover, Jones stated unequivocally that he never knew anything about Kreil's bringing students to his home to work on an alleged scholarship program until after one of the other students came forward with the allegations against Kreil in the spring of 1999. (*See* Jones Dep. at 16–17.)

With respect to Rosetta Riddle, her affidavit also does not establish that she placed Jones on notice that Kreil might be engaging in inappropriate or abusive conduct towards students. According to Riddle, after she had attempted to investigate this purported scholarship program and was unable to uncover any confirmation that it existed, she approached defendant Jones "about the scholarship program and the lack of information on it. . . . Mr. Jones denied having any knowledge of the scholarship." (Riddle Aff. at ¶ 6.) She does not contend that she ever told Jones that the students were regularly meeting at Kreil's house in the evenings, that they were being asked to perform various types of alleged scientific or medical "experimentation," or that they were told by Kreil to keep the program a secret from their parents and other teachers and students. Indeed, there is no evidence in the record that Riddle herself was even aware of any of those circumstances surrounding the bogus scholarship program, or that anyone other than Kreil and the students participating in the group was aware of what the group was doing as part of its "projects" or what was happening during their "research" sessions at Kreil's home.

In any event, even assuming that Jones had been informed that Kreil was involved in an alleged scholarship program that involved meeting with students in his home, plaintiff's evidence falls far short of establishing a pattern and history of widespread rampant abuse of students at the hands of teachers at Westlake High School that went unchecked by Principal Jones. The only evidence in the record related to allegations of sexual misconduct by a Westlake teacher against a student involves the allegations against defendant Kreil that were brought to light when another student in the group, not the plaintiff, reported the bogus scholarship program and Kreil's misconduct to school authorities in the spring of 1999. It is undisputed that Kreil was removed from the classroom almost immediately after that student made the accusations against him, that an investigation was conducted, and that criminal charges were eventually brought against Kreil for his behavior towards the students.

Under these circumstances, the Court concludes that plaintiff has failed to present sufficient evidence that there was such widespread abuse of students by teachers at Westlake High School that defendant Jones should have been placed on notice that corrective action was required. Based on the evidence in the record, plaintiff has shown at most that Jones was merely negligent in not investigating the facts surrounding the purported scholarship program when questions were raised about its legitimacy.[10] Under well settled Eleventh Circuit law, this showing falls far short of establishing a Section 1983 claim against Jones based on supervisory liability. Accordingly, **defendant Jones is entitled to summary judgment on plaintiff's Section 1983 claim against him in his individual capacity.**

---

10. In making the above statement, the Court makes no finding as to whether or not Jones was negligent. It is important to remember that the previous schools in which Kreil had worked had simply terminated him, upon receiving student complaints, and apparently had never sought to revoke his teaching license to prevent him from teaching again. See n. 11 *infra*. Instead, they simply recycled him to unsuspecting schools. Defendant Jones is seemingly the only school official who ever took public action against Kreil, and this action led to Kreil's termination, the suspension of his teaching license, and ultimately his arrest and conviction for his molestation of students. There is some irony in the fact that the only school official who ever took serious action against Kreil is the only school official who has apparently ever been sued as a result of the former's conduct.

## E. *Liability of the School District*

█ Plaintiff has also asserted a claim under Section 1983 directly against the Fulton County School District. Plaintiff argues that the FCSD is liable for the acts of Kreil because Kreil's actions were taken as a direct result of a custom or policy of the FCSD. He contends that it was the custom and/or policy of the FCSD to fail to conduct proper background checks of prospective teachers and that it was a widespread practice of the FCSD to ignore warning signs and complaints about potential teacher misconduct towards students, by failing to take appropriate corrective action to remedy such misconduct.

█ In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be found liable under 42 U.S.C. § 1983 on a theory of *respondeat superior. See also Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir.1997). A local government or one of its agencies or divisions can only be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir.1989) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). Thus, liability under Section 1983 may not be based on an employment relationship linking the local government (including counties as well as municipalities) to the offending employee; rather, "[r]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* (citing *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); *see also Davis v. DeKalb County Sch. Dist.,* 233 F.3d 1367, 1375 (11th Cir.2000).

█ Furthermore, it is not enough to identify conduct that could properly be attributed to the municipality. The plaintiff must also establish that the municipal action was taken with the requisite degree of culpability. In order to impose liability on the municipality itself, the plaintiff must show that the action was taken with "deliberate indifference" to the obvious consequences it would likely have on the rights of the plaintiff or other students. *Davis,* 233 F.3d at 1375–1376 (citing *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989))).

Thus, in order to establish that the FCSD is liable for Kreil's actions, plaintiff must first present sufficient evidence to establish that the actions were taken pursuant to an official "custom" or "policy" of the School District. *See Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1479 (11th Cir.1991); *Fundiller v. Cooper City,* 777 F.2d 1436 (11th Cir.1985). The Court concludes that the plaintiff has failed to present sufficient evidence to create a genuine issue of material fact over whether the FCSD had any custom or policy that was the driving force behind Kreil's alleged violation of the plaintiff's constitutional rights.

█ Obviously, plaintiff does not contend that the school district had a formal policy condoning or endorsing sexual misconduct or sexual assault by public school teachers against students. Indeed, it is undisputed that the FCSD had an explicit policy forbidding discrimination, harassment or abuse of any kind and Kreil almost certainly acted with full knowledge that his conduct towards plaintiff was in complete violation of that policy. Nevertheless, liability under Section 1983 may be imposed on a municipality as a result of an unofficial "custom," even though such cus-

tom has not received formal approval through the body's official decisionmaking channels. *Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1308 (11th Cir.2001). As the Eleventh Circuit has stated:

> [t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Griffin,* 261 F.3d at 1308 (quoting *Brown,* 923 F.2d at 1481 (citations omitted)). In addition, if the municipality tacitly authorizes the constitutional deprivations committed by its employees or routinely displays deliberate indifference to the consequences of acts of misconduct by its employees, then the municipality's failure to take corrective actions can rise to the level of a custom or policy. *Id.* (citing *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987)).

Plaintiff first argues that the school district is liable for Kreil's actions because it failed to follow the guidelines set out by the Georgia Professional Standards Commission for teachers, which required the FCSD to report any breach by a teacher of the Code of Ethics established by the Georgia Professional Standards Commission. (*See* Pl.Ex. C.) Plaintiff has presented evidence that Kreil did not reveal his complete employment history when he applied for a job with the FCSD and that he, in fact, took steps to actively conceal portions of his employment history, which was a breach of the teacher's Code of Ethics.[11]

---

**11.** There is no dispute that Kreil failed to reveal an accurate picture of his employment history when he applied for employment with the FCSD. On his application for employment, Kreil listed only four schools or school districts as previous employers: Caddo Parish, Louisiana, from 1976–80; Jefferson Parish, Louisiana, from 1980–1991; Massey Institute, from 1991–1993; and PTC Institute from 1993 to the date of his application. (*See* Cochran Dep., Ex. A, at 2.) When asked if he had ever been terminated, non-renewed, or asked to resign, he answered "no." (*Id.*) On his "Verification of Professional Employment" form, however, which was filed with the personnel department of the FCSD, Kreil indicated that he had been employed by the Cherokee County school system from August, 1994, to December, 1994, and by the St. John's Parish school system in Louisiana from August, 1983, to March, 1984. (*Id.* at 5–6.)

In reality, Kreil had been employed by many other schools and school districts in both Louisiana and Georgia between 1976 and 1995, most of them for short periods of time, and had been terminated or asked to resign on several occasions for allegations of improper physical contact with students. (*See generally* Kreil Dep. at 5–45.) In 1978, Kreil was asked to resign from a teaching position at Mundy's Mill Junior High School in Clayton County, for having "too close contact with students." (*Id.* at 8.) In 1979, Kreil was asked to leave Walton High School in Cobb County, Georgia, as a result of a cheating incident involving a student. (*Id.* at 10.) It was at Walton High School where Kreil apparently first began involving students in bogus "metabolism" studies, although he claims he did not have improper sexual contact with any students at Walton High School. (*Id.* at 12.) After leaving Walton, Kreil was employed by Fairpark High School in Shreveport, Louisiana, where he was asked to leave in 1981 because of an incident involving his supervision of a field trip during which a student purchased alcohol and became inebriated. (*Id.* at 18.) He then spent a year at Jesuit High School in Shreveport, where he again conducted bogus "metabolism studies," and was asked to leave in 1982 when a parent complained about the bogus project. (*Id.* at 18–19.) He then spent seven months at Fisher High School in Jefferson Parish before being asked to leave in 1984 because of a complaint by a parent about improper conduct. (*Id.* at 21.) He then taught at a high school in St. John's Parish, Louisiana, where he was asked to resign for improper contact with a student in approximately 1984 or 1985. (*Id.* at 24–25.)

Kreil then worked at several jobs at which he taught adults or otherwise did not have

(*See* Cochran Dep. at 47; Pl.Ex. C.) Moreover, plaintiff has also presented evidence that Dan Cochran, FCSD's Director of Personnel Services, eventually became aware that the Kreil's job application was not entirely accurate and complete and that he had omitted portions of his employment history. (*See* Cochran Dep. at 47.) Cochran did not report Kreil to the Georgia Professional Standards Commission, however, nor did he take any other action against Kreil. (*Id.*) Thus, plaintiff argues, the evidence reflects that the FCSD failed to follow professional standards or its own policies and procedures, when it failed to report Kreil's making of material misrepresentations on his job application.

Thus, defendants do not dispute that Kreil made material representations on his employment application, nor do they dispute that there were inconsistencies between his application and his salary verification forms that could have alerted school district employees that Kreil's employment history on his application was inaccurate or incomplete. Nevertheless, defendants argue that plaintiff's evidence concerning the FCSD's failure to detect Kreil's fabri-

cation of his employment history does not constitute evidence of a "custom or policy" of conducting inadequate background investigations with the hiring of teachers.

The Court agrees with defendants and concludes that plaintiff's evidence falls far short of establishing a custom or policy of hiring sexual predators, through a failure to conduct proper background checks of prospective teachers. Even assuming that the FCSD was negligent in its failure to detect Kreil's fabrications and omissions on his employment application, the failure to conduct a thorough background check on one job applicant does not equate to a custom or policy of conducting inadequate background checks for all job applicants. Evidence of a few random acts or isolated incidents is plainly insufficient to establish a custom or policy of the municipality; instead, the plaintiff must present evidence of a persistent and widespread practice. *Depew v. City of St. Marys,* 787 F.2d 1496 (11th Cir.1986).

Plaintiff has not presented any evidence that the FCSD failed to detect material omissions or misrepresentations on the employment application of any prospective

---

contact with minors, but returned to teaching high school students a few years later when he worked at Pacelli High School, a private school in Columbus, Georgia. (*Id.* at 35–36.) Within one year, he was asked to leave for "improper association with students." (*Id.* at 36.) In all, over his more than fifteen years of teaching, Kreil apparently did not work at any high school or junior high school for more than a year before complaints surfaced about his improper contact with students and he was asked to resign.

Despite the numerous complaints and allegations lodged against him for improper conduct towards students at a number of different schools in both Georgia and Louisiana over a fifteen-year period, however, Kreil states that he "never had any trouble renewing my [teaching] certificate" at any time, and was never prosecuted for any of his alleged transgressions against minors. (*Id.* at 44–45.) Moreover, it is undisputed that the FCSD had

no knowledge of any of these matters or that Kreil had even worked at the above schools.

More importantly, it was not until the complaints were made about Kreil at Westlake High School in 1999 that any school district decided to refer the matter to the police, or to take any steps toward having his teaching certification revoked. Instead of merely asking Kreil to resign and then recycling him to an unsuspecting new school, as so many school districts before had done, FCSD took strong steps to insure that Kreil would not again teach minor students. It was the only school district to do so. Indeed, the above recitation of Kreil's misdeeds came through his deposition. There is no indication what policy the above school districts, of which defendant was unaware, followed in disclosing the reasons why an employee left or whether they would have been forthcoming about such matters.

teacher other than Kreil. Thus, plaintiff argues that the FCSD had a custom or policy of conducting inadequate background checks based on evidence that it failed to conduct an adequate background check on *one* teacher. Moreover, the plaintiff argues that the FCSD actually had policies in place that required it to conduct a thorough background investigation of job applicants, but it failed to follow its own policies with respect to Kreil's application.

Under these circumstances, even assuming that the FCSD failed to follow its own procedures in conducting a background check on Kreil and failed to adhere to the appropriate Standards under the Code of Ethics for Educators, and even assuming that the FCSD was negligent in its failure to detect Kreil's omissions and misrepresentations in his employment history, the Court nevertheless concludes that plaintiff has failed to present sufficient evidence that the FCSD had a custom or policy of conducting inadequate background checks of prospective teachers.

 Furthermore, the plaintiff has failed to present evidence that the FCSD was deliberately indifferent to the risks presented by ignoring Kreil's background. As the Supreme Court has stated, in cases in which a plaintiff has brought a claim under Section 1983 based upon an alleged failure to conduct an adequate background check of a job applicant:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 411, 117 S.Ct.

1382, 137 L.Ed.2d 626 (1997); *see also Griffin,* 261 F.3d at 1313.

Thus, under this standard, it is not enough for the plaintiff to show that the FCSD was "indifferent" about the applicant's background. Instead, the plaintiff must demonstrate that the FCSD knowingly disregarded an obvious and likely consequence of hiring Kreil. *See Griffin,* 261 F.3d at 1313–1314 (city acted with deliberate indifference to the risks of hiring an applicant for City Manager without a resume, interview, or background check, when the city was inundated with articles, faxes, and mail warning that the applicant was a notorious sexual harasser and had the nickname Earnie "Penis" Neal).

In order for the FCSD to be liable for a failure to conduct an adequate screening of Kreil's background, the plaintiff must present evidence that the decision to hire Kreil reflected deliberate indifference to the risk that he would sexually harass or abuse students. *Id.* Although the plaintiff argues that the FCSD might have uncovered some information about Kreil's past that might have put them on notice of that risk, had it only conducted a more thorough investigation into Kreil's background, it is undisputed that, when it made the decision to hire Kreil, the FCSD did not have knowledge that Kreil had conducted similar bogus scholarship programs or had committed similar acts against students at other schools in the past. Accordingly, the plaintiff has failed to present sufficient evidence that the FCSD was deliberately indifferent to the risk that Kreil would sexually harass or molest students at Westlake.

Plaintiff argues further that the FCSD had a custom or policy of failing to investigate complaints of misconduct by teachers, and again points to the Todd Green incident in 1997 as evidence. As discussed above, the school district conducted an investigation into the Todd Green incident

and questioned Kreil, Green, and the student involved who had been asked to communicate the message from Kreil to Green. Based upon its investigation, the FSCD concluded that Green and Kreil were involved in some sort of personal relationship, but Green refused to reveal any details and refused to file a complaint against Kreil; thus, the school district took no formal action against Kreil.

Plaintiff argues that Kreil's poor judgment in asking a student to relay a message to Green that Kreil was going to commit suicide if Green did not come to Kreil's house should have alerted the school district that Kreil's conduct around students should be monitored more closely. As discussed above, the Court concludes that the Todd Green incident, which involved a personal dispute between two teachers, was insufficient as a matter of law to put the FCSD on notice that Kreil had a propensity to commit sexual misconduct against students.

Viewing the facts in the light most favorable to plaintiff, the Court finds that the incident undoubtedly reflected extremely poor judgment on Kreil's part to involve a student in his personal relationship with Green and to ask the student to relay such a disturbing message from one teacher to another. Indeed, Linda Souders, the school district official who conducted the investigation into the incident, knew that Green was too embarrassed to reveal the nature of his relationship with Kreil and suspected that something was not "kosher" between Kreil and Green. Nevertheless, it is undisputed that the incident did not involve any allegation that Kreil had committed any act of sexual misconduct towards a student, or that he had a propensity to do so, and thus, that incident did not place the FCSD on actual or con-

structive notice that Kreil might be sexually abusing students.[12]

When a student is attempting to hold a school district liable under Section 1983 for sexual abuse by a teacher or other employee based on a custom or policy of a *failure* to act to prevent the sexual abuse, the plaintiff must establish: (1) the existence of a clear and persistent pattern of sexual abuse by school employees; (2) notice or constructive notice of the abuse to the school district or school board; (3) the school district's tacit approval of the conduct, or deliberate indifference from their failure to correct the problem; and (4) that the school district's failure to act was the "moving force" behind the violation of the plaintiff's constitutional rights. *See Doe v. Claiborne County,* 103 F.3d 495, 506–507 (6th Cir.1996) (citing *City of Canton v. Harris,* 489 U.S. 378, 388–389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Thelma D. v. Bd. of Educ. of City of St. Louis,* 934 F.2d 929, 932–933 (8th Cir. 1991)).

The Court concludes that the plaintiff has failed to present sufficient evidence to establish any of these four elements. Viewing the evidence in the light most favorable to plaintiff, it reflects, at most, that one teacher, defendant Kreil, committed acts of sexual misconduct against plaintiff and other students. There is no evidence that other teachers or employees had committed similar acts in the past so as to make it a persistent or widespread problem that was not being addressed. Furthermore, despite the plaintiff's efforts to impute notice to the FCSD based on the Todd Green incident and Rosetta Riddle's alleged questioning of Jones about the scholarship program, the evidence reflects that the FCSD was not on actual or con-

---

**12.** It is unclear to the Court whether the FCSD could have terminated Kreil based on the Green incident, without risking a law suit by him. The Court is unclear whether Kreil was an "at will" employee or whether the FCSD had to show cause to dismiss him.

structive notice that Kreil was sexually abusing students until one of the students finally came forward to report Kreil's behavior in the spring of 1999, at which time Kreil was immediately removed from the classroom and an investigation was conducted. Accordingly, because it acted immediately to remove Kreil from contact with students and to investigate the allegations, the evidence reflects that, once the FCSD was faced with notice of the problem, it did not act with deliberate indifference, but instead acted swiftly to take corrective action. Finally, because there was no failure to act by the FCSD once it had notice of the problem, any such failure could not be considered the moving force behind Kreil's alleged violation of the plaintiff's constitutional rights.

In sum, plaintiff argues that the FCSD *could* have done more to investigate Kreil's background and *could* have uncovered some of his blatant omissions and falsehoods in his employment application, that it *should* have been more alarmed by Kreil's conduct in the Todd Green incident, that it *should* have taken Rosetta Riddle's concerns about the scholarship program more seriously when she questioned Jones about it, and that it *should* have been monitoring Kreil's conduct with students more closely. If the FCSD had done all these things, plaintiff argues, perhaps the FCSD would have uncovered the truth surrounding the bogus scholarship program and could have prevented Kreil's abuse of plaintiff during the "qualification procedure" at Kreil's home in early 1998.

In order to hold the school district liable under Section 1983 for Kreil's actions, however, it is not enough for the plaintiff to show that there were things that the school district could have done differently, or things it *should* have done differently. As the Supreme Court has stated, "In virtually every instance where a person has had his or her constitutional rights

violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (quoted in *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 453 (5th Cir.1994)).

Instead, in order to hold the school district responsible for Kreil's conduct, the plaintiff must establish that the FCSD was confronted with, at least, constructive notice that Kreil was sexually abusing students, and that the principal and other school district officials were *deliberately indifferent* to the harm that Kreil was causing; *i.e.,* that they essentially ignored very clear unmistakable warning signs that Kreil was abusing students and just looked the other way. To the contrary, FCSD acted promptly when alerted and did not look the other way, as some school districts unfortunately have done. *See, e.g., Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d at 443 (high school principal ignored numerous blatant reports that a teacher was engaged in sexually inappropriate conduct with female students over a period of several years, but did not take any action to reprimand or discipline the teacher until a student's mother discovered love letters from the teacher to her 15–year–old daughter, and contacted an attorney who discovered that the teacher was having a sexual relationship with the student and reported the affair to the superintendent).

Accordingly, the Court concludes that plaintiff has failed to present sufficient evidence to establish either that the Fulton County School District had a custom or policy of failing to act to prevent sexual abuse of students by teachers, or that the school district acted with deliberate indifference when it failed to prevent Kreil's violation of the plaintiff's constitutional rights. Furthermore, because an action

against an officer in his or her official capacity is simply another way of suing the public entity that the official represents, plaintiff may not assert his Section 1983 claims against either Kreil or Jones in their official capacities. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

Defendants Fulton County School District and Marquis Jones's Motion for Summary Judgment [35] is therefore **GRANTED** with respect to plaintiff's Section 1983 claims asserted against them in Count Two of the Complaint. Plaintiff's Section 1983 claim against defendant Kreil in his official capacity is also dismissed, but the **plaintiff may pursue his claim under Section 1983 against Kreil in his individual capacity** for violating the plaintiff's rights to bodily integrity under the Fourteenth Amendment.

### V. *State Law Claims*

In addition to his federal claims, the plaintiff has asserted state law claims of negligence; negligent hiring, retention, and supervision; assault and battery; intentional infliction of emotional distress; and false imprisonment, against Fulton County School District, Marquis Jones, individually and in his official capacity as Principal of Westlake High School, and William Kreil, individually and in his official capacity as a teacher at Westlake High School.

### A. *Claims Against Defendant FCSD*

 The school district defendants have moved for summary judgment on the state law claims against them on the grounds that they are entitled to sovereign and official immunity. The doctrine of sovereign (or governmental) immunity is found in Art. I, Sec. II, Par. IX of the Georgia Constitution of 1983, as amended in 1991. Pursuant to this constitutional provision, counties and other political subdivisions of the State of Georgia are absolutely immune from suit for tort liability, unless that immunity has been specifically waived pursuant to "an Act of the General Assembly which specifically provides that sovereign immunity is waived and the extent of such waiver." *Gilbert v. Richardson,* 264 Ga. 744, 747, 452 S.E.2d 476, 479 (1994) (quoting the 1991 amendments to the Georgia Constitution). Sovereign immunity applies equally to county-wide public school districts in Georgia, unless such immunity is waived. *Wellborn v. DeKalb County Sch. Dist.,* 227 Ga.App. 377, 379, 489 S.E.2d 345, 347 (1997); *Crisp County Sch. Sys. v. Brown,* 226 Ga.App. 800, 800–801, 487 S.E.2d 512, 514 (1997); *Coffee County Sch. Dist. v. Snipes,* 216 Ga.App. 293, 294, 454 S.E.2d 149, 150 (1995).

The Georgia Tort Claims Act provides for a limited waiver of the state's sovereign immunity for the torts of its officials and employees, but the Act expressly excludes counties and school districts from the waiver. O.C.G.A. § 50–21–22(5); *see also Snipes,* 216 Ga.App. at 295, 454 S.E.2d at 150. Therefore, the Georgia Tort Claims Act does not divest the School District of its sovereign immunity. Because sovereign immunity can only be waived by a legislative act that specifically states that sovereign immunity is waived, and the plaintiff has failed to identify any legislative act that waives the immunity of the School District in this action, the FCSD is immune from suit on plaintiff's state law claims. *See Wellborn,* 227 Ga. App. at 377–80, 489 S.E.2d at 347–348; *Snipes,* 216 Ga.App. at 294, 454 S.E.2d at 150; *see also Davis v. DeKalb County Sch. Dist.,* 996 F.Supp. 1478, 1484 (N.D.Ga. 1998).

Accordingly, defendants' Motion for Summary Judgment [35] is **GRANTED** with respect to all of plaintiff's state law claims against defendant FCSD.

### B. *Claims Against Defendant Jones*

Plaintiff has also asserted his state law claims against defendant Jones, in both his individual and official capacity as Principal of Westlake High School. As the Court has already discussed above, the plaintiff's claims against Jones in his official capacity are, in essence, claims against the school district; thus, Jones is also entitled to the defense of sovereign immunity with respect to the claims against him in his official capacity. *See Donaldson v. Dept. of Transp.*, 262 Ga. 49, 414 S.E.2d 638 (1992).

 With respect to the claims made against him in his individual capacity, Jones argues that he is entitled to official immunity. Whereas sovereign (governmental) immunity applies to bar tort claims against counties and their employees acting in their official capacities, official immunity, as recognized under Georgia law, offers limited protection to public officials and employees from tort claims against them in their individual capacities. *See Woodard v. Laurens County*, 265 Ga. 404, 406, 456 S.E.2d 581, 583 (1995); *Gilbert*, 264 Ga. at 750, 452 S.E.2d at 481. County employees are protected from suits against them in their individual capacities for discretionary acts performed within the scope of their public duties, as long as those discretionary acts were performed "without malice." *See Coffey v. Brooks County*, 231 Ga.App. 886, 888, 500 S.E.2d 341, 345 (1998), *rev'd on other grounds, Rowe v. Coffey*, 270 Ga. 715, 715–716, 515 S.E.2d 375 (1999). The Georgia Constitution provides that no official immunity is provided, however, for "ministerial acts negligently performed or for ministerial or discretionary acts performed with malice or an intent to injure." *Woodard*, 265 Ga. at 406, 456 S.E.2d at 583 (quoting 1991 amendments to the Constitution); *Gilbert*, 264 Ga. at 752, 452 S.E.2d at 482–483; *Brown*, 226 Ga.App. at 802, 487 S.E.2d at 515.

 Thus, in order to determine whether Jones is protected by official immunity, the Court must first determine whether the acts involved are discretionary or merely ministerial. Discretionary acts are defined as those acts that require the exercise of personal deliberation, judgment or discretion in the performance of an official duty. *See, e.g., Coffey*, 231 Ga. App. at 889, 500 S.E.2d at 346; *Brown*, 226 Ga.App. at 802, 487 S.E.2d at 515. Ministerial acts, on the other hand, are acts that are "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring the execution of a specific duty." *Coffey*, 231 Ga.App. at 889, 891, 500 S.E.2d at 346, 347 (citation omitted) ("Procedures or instructions adequate to cause an action to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty."). A court's determination of whether a particular act is ministerial or discretionary is determined by the facts of the particular case. *Woodard*, 265 Ga. at 407, 456 S.E.2d at 583.

 The Court finds that all the acts complained of by plaintiff, including all acts involving personnel decisions, are inherently discretionary acts. *See Bitterman v. Atkins*, 217 Ga.App. 652, 458 S.E.2d 688 (1995); *McDay v. City of Atlanta*, 204 Ga.App. 621, 420 S.E.2d 75 (1992); *City of Atlanta v. Fry*, 148 Ga.App. 269, 251 S.E.2d 90 (1978). Thus, in order for plaintiff to establish that defendant Jones is not entitled to official immunity, plaintiff must show that he performed his official duties in hiring, supervising, and retaining defendant Kreil with actual malice. The term "actual malice," when used in the context of the official immunity doctrine, "requires a deliberate intention to do

wrong." *Crisp County Sch. Sys.*, 226 Ga. App. at 802, 487 S.E.2d at 515–516. The term does not include "implied malice," or acts involving a "reckless disregard for the safety of others." *Id.*

Plaintiff has presented no evidence that would allow a reasonable jury to conclude that defendant Jones acted with actual malice, or an intent to harm plaintiff. Indeed, the plaintiff has failed even to respond to defendants' arguments that they are entitled to sovereign and official immunity on plaintiff's state law claims. Thus, defendant Jones is entitled to official immunity on plaintiff's state law claims.

Accordingly, defendants' Motion for Summary Judgment [35] is **GRANTED** with respect to all of plaintiff's state law claims against defendant Jones, in both his individual and official capacities. Moreover, as plaintiff's state law claims against defendant Kreil in his official capacity are also claims asserted against the FCSD, those claims are also **DISMISSED.**

### C. *Claims Against Kreil*

Plaintiff has moved for summary judgment on his claims of assault and battery, false imprisonment, and intentional infliction of emotional distress asserted against Kreil in his individual capacity.

### 1. Assault and Battery

Plaintiff contends that defendant Kreil's admission that he touched the plaintiff in an improper and offensive way, and Kreil's guilty plea to a charge of sexual assault against plaintiff preclude him from disputing plaintiff's claim against him for assault and battery. As discussed above, Kreil has admitted that the plaintiff was brought to his home under the false pretense of a fictitious scholarship program, and Kreil has admitted to touching plaintiff in his genital areas and buttocks. Kreil argues, however, that summary judgment on this claim is not warranted be-

cause it is a disputed issue of material fact whether the plaintiff consented to the acts. Defendant contends that plaintiff came to his home voluntarily, and was never forced or coerced at any time to participate in the acts that plaintiff alleges constitute an unlawful assault and battery.

Under Georgia law, a person commits the offense of simple assault when he either "attempts to commit a violent injury to the person of another," or "commits an act which places another in reasonable apprehension of immediately receiving a violent injury." O.C.G.A. § 16–5–20. A person commits a battery when he either "[i]ntentionally makes physical contact of an insulting or provoking nature with the person of another," or "[i]ntentionally causes physical harm to another." O.C.G.A. § 16–5–23; *see also* O.C.G.A. §§ 51–1–13; 51–1–14 (creating private right of action for the tort of assault and battery). However, "consent to the act by the person affected negates the contact as an actionable tort. 'As a general rule there can be no tort committed against a person consenting thereto, if that consent is free and not obtained by fraud, and is the action of a sound mind.'" *Mims v. Boland,* 110 Ga.App. 477, 481–482, 138 S.E.2d 902, 906 (1964); *see Harris v. Leader,* 231 Ga.App. 709, 710, 499 S.E.2d 374, 376 (1998); O.C.G.A §§ 51–11–1 and 51–11–2.

The undisputed evidence in this action reflects that the plaintiff was brought to Kreil's home under false pretenses, and submitted to the offensive touching under false pretenses. Defendant Kreil does not dispute that he told the plaintiff that the "qualification" procedure was part of a scholarship program that would be awarding up to $100,000 in college scholarship money; nor does he dispute that he told the plaintiff that "doctors" would be touching the plaintiff as part of an "experi-

ment." In sum, the undisputed evidence reflects that the plaintiff was never told that the defendant would be touching him, and thus, although the plaintiff did not protest the acts at the time, any alleged "consent" to the acts was obtained by fraud and does not absolve the defendant of liability for assault and battery to the plaintiff.

Under these circumstances, plaintiff has established that he did not consent to the defendant touching him, and defendant has failed to present any evidence that the plaintiff was a willing participant in the defendant's acts against him. Indeed, if the plaintiff were a willing participant, it stands to reason that the defendant would not have had to go to such great lengths to concoct the elaborate scheme about the scholarship program and the various "projects" in order to lure the plaintiff to his home so that the defendant could carry out these acts against the plaintiff.

 The Georgia Court of Appeals has held that "[a]ny unlawful touching of a person's body, even though no physical injury ensues, violates a personal right and constitutes a physical injury to that person. 'Any act of physical violence (and the law will not draw a line between different degrees of violence), inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact, constitutes an assault and battery.'" *Brown v. Super Disc. Mkts., Inc.,* 223 Ga.App. 174, 176, 477 S.E.2d 839, 841 (1996) (citing *Christy Bros. Circus v. Turnage,* 38 Ga.App. 581, 144 S.E. 680 (1928); *Greenfield v. Colonial Stores, Inc.,* 110 Ga.App. 572, 574–575, 139 S.E.2d 403 (1964); *Kemp v. Rouse–Atlanta, Inc.,* 207 Ga.App. 876, 880, 429 S.E.2d 264 (1993)).

The Court concludes that there is no genuine issue of material fact, and plaintiff is entitled to summary judgment on his claim of assault and battery against defen-

dant Kreil. Accordingly, plaintiff's Motion for Summary Judgment [34] is GRANTED with respect to plaintiff's claim of assault and battery against defendant Kreil individually, and that claim will proceed to trial solely on damages.

### 2. False Imprisonment

 Plaintiff's next claim against defendant Kreil individually is for false imprisonment. Georgia law defines false imprisonment as "the unlawful detention of the person of another, for any length of time, whereby he is deprived of his personal liberty." O.C.G.A. § 51–7–20. Thus, the only essential elements in an action to recover damages for illegal arrest or false imprisonment are the arrest or detention and the unlawfulness thereof. *Drug Emporium, Inc. v. Peaks,* 227 Ga.App. 121, 129, 488 S.E.2d 500, 506 (1997).

> Any restraint, however slight upon another's liberty to come and go as he pleases, constitutes an arrest. There is an illegal arrest and false imprisonment of another where he is detained for any length of time against his will. The restraint constituting a false imprisonment may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened, and result in a reasonable fear of personal difficulty or personal injuries.

*Burrow v. K–Mart Corp.,* 166 Ga.App. 284, 287, 304 S.E.2d 460, 463–464 (1983) (internal quotes and citations omitted).

The undisputed evidence reflects that the plaintiff was brought to the defendant's home under false pretenses, and he has stated that he did not protest the defendant's actions, and spent the night in defendant's guest bedroom, out of fear for what might happen to him if he com-

plained or protested. Plaintiff has not presented evidence that he ever asked defendant if he could leave, or that he told the defendant he wanted to go home. Defendant contends that the plaintiff was never forced or coerced, or threatened in any way, and that he stayed at defendant's house voluntarily and never asked to go home or be taken home by defendant.

Under these circumstances, the Court concludes that there is a genuine issue of material fact over whether the defendant's words or actions would have induced a reasonable apprehension in the plaintiff that force would have been used against him had he attempted to leave the defendant's house, or otherwise led him to believe that he was not free to leave the defendant's house, on the evening of the "qualification" procedure. Accordingly, plaintiff's Motion for Summary Judgment [34] is **DENIED** with respect to his claim of false imprisonment.

### 3. Intentional Infliction of Emotional Distress

██ Plaintiff has also asserted a claim against Kreil under Georgia law for intentional infliction of emotional distress, and has moved for summary judgment on that claim.

██ Georgia courts have recognized the tort of intentional infliction of emotional distress by stating:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Yarbray v. S. Bell Tel. & Tel. Co.,* 261 Ga. 703, 706, 409 S.E.2d 835, 837 (1991) (quoting The Restatement (Second) of Torts § 46(1) (1965)); *see also Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 229, 335 S.E.2d 445 (1985). In order to sustain

a cause of action, the defendant's actions must have been so terrifying as naturally to humiliate, embarrass or frighten the plaintiff. *Cornelius v. Auto Analyst, Inc.,* 222 Ga.App. 759, 476 S.E.2d 9, 11 (1996) ("The conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (citation and internal quotation marks omitted); *see also Moses v. Prudential Ins. Co. of America,* 187 Ga. App. 222, 224, 369 S.E.2d 541 (1988); *Sossenko v. Michelin Tire Corp.,* 172 Ga.App. 771, 772, 324 S.E.2d 593 (1984); Comment d § 46(1) of the Restatement (Second) of Torts ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!' ") (quoted in *Yarbray,* 261 Ga. at 706, 409 S.E.2d at 837).

██ To make out a *prima facie* case of intentional infliction of emotional distress under Georgia law, a plaintiff must prove each of the following elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Bridges,* 176 Ga.App. at 230, 335 S.E.2d at 447–48; *see also Gaston v. Southern Bell Tel. & Tel. Co.,* 674 F.Supp. 347, 352 (N.D.Ga. 1987). The burden that a plaintiff must meet in order to prevail on this claim is a stringent one. *Bridges,* 176 Ga.App. at 229, 335 S.E.2d at 447.

██ Whether conduct is sufficiently outrageous and whether the resulting emotional distress is sufficiently severe to support a claim of intentional infliction of emotional distress are questions of law. *Yarbray,* 409 S.E.2d at 838; *accord Clark*

*v. Coats & Clark, Inc.,* 990 F.2d 1217, 1229 (11th Cir.1993). "If the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." *Yarbray,* 409 S.E.2d at 838.

Based on the undisputed evidence presented in this action, the Court finds that the acts committed by defendant Kreil against the plaintiff go beyond all possible bounds of decency, and would be considered atrocious and utterly intolerable in a civilized community. Defendant used his position of trust and authority as a public high school teacher to take advantage of impressionable teenagers. He gained their trust and then used that trust for his own perverted scheme to lure them to his home to participate in fake "experiments" by which he induced them to partially, or in the case of plaintiff, totally disrobe, so that he could touch them to satisfy his own sexual desires. The average member of the community would almost certainly find defendant's acts to be despicable and "outrageous." Furthermore, there is no dispute that defendant acted intentionally in carrying out his scheme.

Nevertheless, the final element that the plaintiff must establish is that he suffered severe emotional distress as a direct result of the defendant's actions. Plaintiff argues in his brief that he suffered "severe and debilitating emotional distress" as a result of defendant's actions, but he has failed to elaborate as to the extent of his emotional distress, and he has failed to identify the evidence in the record that supports that element of his claim.

While the plaintiff has undoubtedly suffered greatly as a result of defendant's actions, the Court must conclude that he has not presented evidence on this issue to the extent necessary to establish his claim for intentional infliction of emotional distress as a matter of law. Thus, the Court finds that a jury question remains as to whether the plaintiff has established that he suffered severe emotional distress as a direct result of the defendant's actions against him. Accordingly, plaintiff's Motion for Summary Judgment [34] is **DENIED** with respect to this claim and it shall proceed to trial.

## CONCLUSION

For all the above reasons, plaintiff's partial Motion for Summary Judgment [34] is **GRANTED in part and DENIED in part,** defendants Fulton County School District and Marquis Jones's Motion for Summary Judgment [35] is **GRANTED** in its entirety, and defendants Fulton County School District and Marquis Jones's Notice of Objection and Motion to Strike Affidavits [44] is **DENIED.**

Plaintiff's Partial Motion for Summary Judgment [34] is **GRANTED** with respect to his claim of assault and battery against defendant Kreil individually, but **DENIED** with respect to his remaining claims. Plaintiff's Section 1983 claim against defendant Kreil individually, as well as his state law claims against defendant Kreil, will proceed to trial. Plaintiff and defendant Kreil shall file a Consolidated Pretrial Order within sixty (60) days of the entry of this Order.[13]

---

13. As noted in a separate Order by this Court, the latter will allow the plaintiff and defendant Kreil **thirty (30) days** to determine if they can settle this case without a trial. If there is no settlement, the consolidated pretrial order will be due **thirty (30) days** later, or **sixty (60) days** from the date of this Order.